UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                  :

UNITED STATES OF AMERICA         :
                                  :

           - v. -              :        14 Cr. 243 (JSR)
                                  :

ROBERT M. FAIELLA,            :
  a/k/a "BTCKing,"           :
                                  :

          Defendant.       :
                                  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COUNT ONE OF THE INDICTMENT


PREET BHARARA
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

SERRIN TURNER
     Assistant United States Attorney
     *Of Counsel*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................. 1

FACTUAL BACKGROUND ..................................................................................................... 2

   A.  Bitcoins and Bitcoin Exchangers ................................................................................. 2

   B.  Silk Road's Bitcoin-Based Escrow System ................................................................. 3

   C.  Faiella's Operation of a Bitcoin Exchange on Silk Road ............................................ 4

PROCEDURAL BACKGROUND .............................................................................................. 4

LEGAL STANDARD ................................................................................................................ 5

ARGUMENT: Count One Properly Alleges that  Faiella Operated an Unlicensed Money
Transmitting Businesses .............................................................................................................. 6

   A.  Applicable Law ............................................................................................................ 6

   B.  Discussion .................................................................................................................... 7

       1.  Bitcoins Are the Digital Equivalent of Cash and Readily Qualify as "Funds" .......... 7

       2.  Faiella Engaged in "Money Transmitting" by Transferring Funds on Behalf
          of His Customers to Silk Road ............................................................................... 12

       3.  The Application of Section 1960 to a Bitcoin Exchanger Does Not Violate
          the Rule of Lenity or the Due Process Clause ........................................................ 14

       4.  Bitcoin Exchangers Are Required to Register as Money Transmitters with
          FinCEN .................................................................................................................... 17

CONCLUSION ......................................................................................................................... 18

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Barr v. United States*, 324 U.S. 83 (1945) ................................................................................. 11

*Moskal v. United States*, 498 U.S. 103 (1990) ........................................................................ 14, 15

*Ortiz v. N. Y.S. Parole*, 586 F.3d 149 (2d Cir. 2009) ................................................................. 16

*Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1998) .................................................................... 11

*Reno v. Koray*, 515 U.S. 50 (1995) ............................................................................................ 14

*SEC v. Shavers*, 13 Civ. 416, 2013 WL 4028182 (E.D. Tex. Aug. 6, 2013) ................................ 8

*Taniguchi v. Kan Pacific Saipan, Ltd.*, 132 S.Ct. 1997 (2012) .................................................... 7

*United States v. Alfonso*, 143 F.3d 772 (2d Cir.1998) ................................................................. 6

*United States v. Ali*, 515 F. 3d 100 (2d Cir. 2008) ..................................................................... 16

*United States v. Coffey*, 361 F. Supp. 2d 102 (E.D.N.Y. 2005) ................................................... 5

*United States v. Elie*, No. S3 10 Cr. 336 .................................................................................... 6

*United States v. E-Gold, Ltd.*, 550 F. Supp. 2d 82 (D.D.C. 2008) ...................................... passim

*United States v. Litchfield*, 986 F.2d  (2d Cir. 1993) .................................................................. 14

*United States v. Mazza-Alaluf*, 621 F.3d 205 (2d Cir. 2010) ................................................. 16, 17

*United States v. Pfeiffer*, 371 F.3d 430 (8th Cir. 2004) .......................................................... 17

*United States v. Post*, 950 F. Supp. 2d 519 (S.D.N.Y. 2013) ...................................................... 5

*United States v. Sampson*, 371 U.S. 75 (1962) ........................................................................... 6

*United States v. Stavroulakis*, 952 F.2d 686 (2d Cir. 1992) ........................................................ 5

*United States v. Ulbricht*, No. 14 Cr. 68, 2014 WL 3362059 (KBF) (S.D.N.Y. Jul. 9, 2014) ....... 8

*United States v. Venturella*, 391 F.3d 120 (2d Cir. 2004) .......................................................... 15

*United States v. Walsh*, 194 F.3d 37 (2d Cir. 1999) .................................................................... 5

*Yayasan Sabah Dua Shipping 5DN BHB v. Scandinavian Liquid Carriers, Ltd.*, 335 F. Supp. 2d 441 (S.D.N.Y. 2004) ................................................................................................................ 13

**Statutes**

18 U.S.C. § 1956(h) ........................................................................................................ 5

18 U.S.C. § 1960 .................................................................................................... passim

**Rules**

Fed. R. Crim. P. 12(b) ..................................................................................................... 6

**Regulations**

31 C.F.R. § 1010.100(ff)(5) ..................................................................................... 3, 18

**Other Authorities**

*Black's Law Dictionary* 743 (9th ed. 2009) ................................................................. 8

FinCEN, *Guidance on the Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies*, March 18, 2013, FIN-2013-G001, at 4-5, *available at* http://www.fincen.gov/statutes_regs/guidance/pdf/FIN-2013-G001.pdf ............................. 3

IRS Notice 2014-21, *available at* http://www.irs.gov/pub/irs-drop/n-14-21.pdf ....................... 11

*Oxford English Dictionary* (2d ed. 1989) .................................................................... 8

*Random House Dictionary* (4th ed. 2001) .................................................................. 8

Satoshi Nakamoto, *Bitcoin: A Peer-to-Peer Electronic Cash System* ........................................... 8

## PRELIMINARY STATEMENT

The charge in Count One of the Indictment is straightforward: defendant Robert Faiella ran a business that moved money for customers to a black-market website, Silk Road, so they could make illicit purchases there. Faiella operated his business without ever registering it with federal authorities and with full awareness that it was facilitating criminal activity. In doing so, Faiella violated Title 18, United States Code, Section 1960, which makes it a crime to transfer money for others as a business without obtaining appropriate licenses, or to do so while knowing that money passing through the business is being used to promote illegal conduct.

Faiella moves to dismiss Count One solely on the ground that the money he moved for his customers took the form of Bitcoins. This position has no support in the statutory text, legislative history, or relevant case law. Section 1960 is an anti-money laundering statute intended to impede the movement of funds involved in criminal activity. It prohibits money transmitters of all stripes from moving money in an unlicensed or knowingly criminal fashion. The statute thus broadly applies to any business engaged in "transferring funds" on behalf of its customers – "by any and all means." As courts in this district and elsewhere have held, virtual currencies such as Bitcoin easily qualify as "funds," as they are a digital substitute for cash that can be used to conduct monetary transactions online – as the very term "virtual currency" implies. Moreover, Faiella engaged in "transferring funds" for his customers by transmitting Bitcoins to their accounts on Silk Road, where they could use the funds to conduct unlawful transactions.

In short, Faiella's conduct unambiguously falls within both the letter and spirit of the statute. Accordingly, his motion to dismiss should be denied.

# FACTUAL BACKGROUND[1]

**A.      Bitcoins and Bitcoin Exchangers**

Bitcoins are a form of virtual currency, existing entirely on the Internet and not in any physical form.  The currency is not issued by any government, bank, or company, but rather is generated and controlled automatically through computer software operating on a decentralized, "peer-to-peer" network.

Bitcoins are stored on the Bitcoin network in what are called Bitcoin "addresses."  A Bitcoin address is analogous to a bank account number, designated by a complex string of letters and numbers.  Each Bitcoin address is controlled through the use of a unique, corresponding "private key" – a kind of cryptographic password needed to access the address.  Only a holder of the "private key" for an address can authorize any transfers of Bitcoins from that address to other Bitcoin addresses.  No identifying information about the payor or payee is transmitted in a Bitcoin transaction.  Only the Bitcoin addresses of the parties are needed for the transaction, which by themselves do not reflect any identifying information.

To acquire Bitcoins, a user typically must purchase them from a Bitcoin "exchanger." Bitcoin exchangers generally accept payments of conventional currency and, in return for a commission, transfer a corresponding number of Bitcoins, based on a floating exchange rate, to a Bitcoin address designated by the customer.  Bitcoin exchangers doing business in the United States are considered money transmitters under federal anti-money laundering ("AML") regulations and are required to register with the Financial Crimes Enforcement Network

---

[1] The following background is based on the facts set forth in the Indictment and the Complaint, and, to a limited degree, additional facts that the Government intends to prove were the case to proceed to trial.  These facts do not constitute a full proffer of the Government's evidence but are offered only to provide context to the allegations of the Indictment.

("FinCEN"). *See* 31 C.F.R. § 1010.100(ff)(5); *see also* FinCEN, *Guidance on the Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies*, March 18, 2013, FIN-2013-G001, at 4-5, *available at* http://www.fincen.gov/statutes_regs/ guidance/pdf/FIN-2013-G001.pdf ("FinCEN Guidance") (attached as Ex. A).

**B.     Silk Road's Bitcoin-Based Escrow System**

The "Silk Road" website was an anonymous marketplace for illegal drugs that operated from in or about January 2011 until October 2, 2013, when it was seized by law enforcement. The website was specifically designed to enable vendors and buyers to conduct illicit transactions over the Internet.  The website was accessible only through the Tor network, a special network on the Internet designed to conceal the true IP addresses, and thereby the identities, of its users.  Further, Bitcoins were the only form of payment accepted on the site, which enabled users to make purchases on the site anonymously.

Silk Road included a Bitcoin-based escrow system that users were required to use in order to conduct any business with other site users.  The escrow system worked as follows: Every Silk Road user account had a Bitcoin address associated with it that could be used to fund the account.  To move funds into the account, the user could buy Bitcoins from a Bitcoin exchanger and have the exchanger send the Bitcoins to the Bitcoin address associated with the account.  This Bitcoin address was under the control of Silk Road – that is, the private key needed to authorize transactions with the address was held by Silk Road, not the user.  Further, the Bitcoin address associated with the user's account was only an entry point for the user's funds: once Bitcoins were transferred to the address, they would be automatically transferred to other Silk Road-controlled addresses and mixed together with all of the other funds Silk Road held in escrow for its users.  As an internal accounting matter, the funds initially transferred to the Bitcoin address associated with the user's account would remain credited to the account; and

the user could access the funds using Silk Road's online interface in order to pay for purchases from Silk Road vendors.  However, Silk Road retained ultimate control over the funds.  A user could not access the funds in his Silk Road account from outside Silk Road, and Silk Road administrators could limit or block users' access to the funds at will – for example, as part of site maintenance or disciplinary actions against the user.

**C.     Faiella's Operation of a Bitcoin Exchange on Silk Road**

From in or about December 2011 to in or about October 2013, Faiella operated an underground Bitcoin exchange service on Silk Road, under the username "BTCKing."  Faiella specifically marketed his service to Silk Road users, offering them the ability to fund their Silk Road accounts with complete anonymity.  Specifically, Faiella would instruct a customer wanting to buy Bitcoins from him to deposit cash into a bank account that he would specify. Through a series of transactions, Faiella would then exchange the cash for Bitcoins and transfer the funds, less his commission of around ten percent, to the Bitcoin address associated with the customer's Silk Road account.

Faiella was one of the most popular Bitcoin exchangers on Silk Road and moved well over $1 million to the Silk Road website through his business.  Faiella knew that he was operating a money transmitting business that he was legally required to register with FinCEN; yet he never did so.  Moreover, at no time did Faiella comply with federal AML rules applicable to money transmitters, including, most significantly, identifying and filing suspicious activity reports concerning his customers, who Faiella knew were using the Bitcoins he was selling them to make illicit purchases on Silk Road.

**PROCEDURAL BACKGROUND**

On January 24, 2014, Faiella was charged by complaint along with co-defendant Charlie Shrem.  Count One charged Faiella with operating an unlicensed money transmitting business in

4

violation of Title 18, United States Code, Sections 1960(b)(1)(B) and (C), while Count Two charged both Faiella and Shrem with conspiring to commit money laundering in violation of Title 18, United States Code, Section 1956(h).  On April 10, 2014, Faiella was charged with the same offenses by indictment.

On July 4, 2014, Faiella filed the instant motion.  The motion seeks the dismissal of Count One of the Indictment, the unlicensed money transmitting business charge, on the asserted ground that Faiella's conduct does not fall within the scope of Section 1960.  Specifically, Faiella argues that Bitcoins are not "funds" and that his operation of a Bitcoin exchanger did not involve the "transfer" of funds as entailed by Section 1960's definition of "money transmitting."

## LEGAL STANDARD

"A defendant faces a high standard in seeking to dismiss an indictment, because an indictment need provide the defendant only a plain, concise, and definite written statement of the essential facts constituting the offense charged."  *United States v. Post*, 950 F. Supp. 2d 519, 527 (S.D.N.Y. 2013) (internal quotation marks and citations omitted) (citing Fed. R. Crim. P. 7(c)(1)).  "An indictment must be read to include facts which are necessarily implied by the specific allegations made."  *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992).  It "does not have to specify evidence or details of how the offense was committed."  *United States v. Coffey*, 361 F. Supp. 2d 102, 111 (E.D.N.Y. 2005).  Indeed, the Second Circuit has "consistently upheld indictments that 'do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'"  *United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999) (citing *United States* v. *Tramunti*, 513 F.2d 1087, 1113 (2d Cir. 1975)).

5

Federal criminal procedure does not provide for pretrial determination of the sufficiency of the evidence. "[T]here is no summary judgment in criminal cases." *United States v. Elie*, No. S3 10 Cr. 336 (LAK), 2012 WL 383403, at *1 (S.D.N.Y. Feb. 7, 2012). Thus, in the absence of a full proffer of the government's evidence, "the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment." *United States v. Alfonso*, 143 F.3d 772, 776-77 (2d Cir. 1998). Instead, the Court is limited to determining whether the allegations of the indictment, taken as true and including all facts necessarily implied, are sufficient to establish a violation of the charged offense. *United States v. Sampson*, 371 U.S. 75, 78-79 (1962). Accordingly, to the extent Faiella's motion could be construed to raise factual issues concerning whether the Government will be able to prove all the elements of the offense at trial, those issues are not appropriately addressed here. *See* Fed. R. Crim. P. 12(b) (providing that a motion to dismiss may raise "any defense, objection, or request that the court can determine without a trial of the general issue").

## ARGUMENT

### Count One Properly Alleges that
### Faiella Operated an Unlicensed Money Transmitting Businesses

**A.      Applicable Law**

Title 18, United States Code, Section 1960, makes it a crime to operate an "unlicensed money transmitting business." 18 U.S.C. § 1960(a) . The term "money transmitting" is defined in the statute as "transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier." *Id.* § 1960(b)(2).

The statute sets forth three circumstances under which a business constitutes an "unlicensed money transmitting businesses" within the scope of its prohibition. Section

6

1960(b)(1)(A) makes it a crime to operate a money transmitting business without an appropriate state license where one is required.  Section 1960(b)(1)(B) makes it a crime to operate a money transmitting business without registering with federal authorities (*i.e.*, FinCEN) if required by federal regulation.  And Section 1960(b)(1)(C) makes it a crime to operate a money transmitting business – whether licensed by any authority or not – that "involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity."  Faiella is charged with violating the latter two provisions of the statute – *i.e.*, he is charged with operating a money transmitting business that was not registered with FinCEN and that involved the transmission of funds he knew were intended to be used to promote or support unlawful activity.

## B.     Discussion

### 1.     Bitcoins Are the Digital Equivalent of Cash and Readily Qualify as "Funds"

Faiella's primary argument is that Section 1960 applies only to businesses engaged in transmitting real currency, and that a Bitcoin exchanger therefore falls outside its scope.  (Br. 3).  The argument is meritless.  As reflected by the statute's plain language, its legislative history, and case law precisely on point, Section 1960 applies to transmitters not just of real currency, but of any type of "funds" – a term that easily encompasses virtual currencies such as Bitcoin.

As noted, Section 1960 broadly defines "money transmitting" to include "transferring *funds* on behalf of the public *by any and all means*."  18 U.S.C. § 1960(b)(2) (emphasis added).  As the statute does not specifically define the term "funds," the term is given its ordinary meaning.  *See Taniguchi v. Kan Pacific Saipan, Ltd.*, 132 S.Ct. 1997, 2002 (2012) ("When a term goes undefined in a statute, we give the term its ordinary meaning.").  The term "funds" is a flexible one, encompassing any liquid form of value that can substitute for cash.  Black's Law Dictionary, for example, defines "fund" as "a sum of money or other liquid assets established for

7

a specific purpose." *Black's Law Dictionary* 743 (9th ed. 2009). A "liquid asset" is defined by cross-reference to "current asset," *id.* at 1014, which means "[a]n asset that is readily convertible into cash," *id.* at 134. Other, non-legal dictionaries define the term "funds" in a similarly open-ended fashion. The Oxford English Dictionary, for example, defines "funds" as "money at a person's disposal; pecuniary resources." *Oxford English Dictionary* (2d ed. 1989). The term "pecuniary" is defined in turn as "of or relating to money; monetary; financial." *Id.*; *see also Random House Dictionary* (4th ed. 2001) (defining "funds" as "money immediately available; pecuniary resources").

Bitcoin neatly fits such description. Bitcoin was specifically designed to serve as the digital equivalent of cash. *See* Satoshi Nakamoto, *Bitcoin: A Peer-to-Peer Electronic Cash System*, *available at* https://bitcoin.org/bitcoin.pdf (original concept paper by Bitcoin's creator). And it is in fact so used. Unlike "cars, real estate, baseball cards, [and] Beanie Babies," (Br. 6-7), Bitcoin can easily be purchased in exchange for ordinary currency and used to conduct financial transactions. *See SEC v. Shavers*, 13 Civ. 416, 2013 WL 4028182, at *2 (E.D. Tex. Aug. 6, 2013) ("It is clear that Bitcoin can be used as money. It can be used to purchase goods or services, and . . . used to pay for individual living expenses. . . . [I]t can also be exchanged for conventional currencies."). The huge volume of sales processed through the Silk Road website, all paid for with Bitcoins, attests to Bitcoin's pecuniary value and ready liquidity.

Indeed, these points were recently addressed in the ongoing prosecution of the alleged owner and operator of Silk Road, *United States v. Ulbricht*, No. 14 Cr. 68 (KBF), in which Judge Forrest specifically held, in ruling on a motion to dismiss, that Bitcoins qualify as "funds." 2014 WL 3362059, at *24 (S.D.N.Y. Jul. 9, 2014). In that case, the defendant stands charged among other things with money laundering conspiracy, and moved to dismiss that charge based on the

argument, similar to the one Faiella advances here, that the term "funds" as used in the money laundering statute only encompasses real currency.  Rejecting the argument, Judge Forrest found that the term "funds" easily encompasses Bitcoins, explaining:

> Put simply, "funds" can be used to pay for things in the colloquial sense.  Bitcoins can be either used directly to pay for certain things or can act as a medium of exchange and be converted into a currency which can pay for things.  Indeed, the only value for Bitcoin lies in its ability to pay for things—it is digital and has no earthly form; it cannot be put on a shelf and looked at or collected in a nice display case. . . .  Sellers using Silk Road are not alleged to have given their narcotics and malicious software away for free—they are alleged to have sold them.

2014 WL 3362059, at *24 (S.D.N.Y. Jul. 9, 2014).

Judge Forrest's holding is not a novel one.  The term "funds" has previously been construed to encompass virtual currency, specifically in the context of Section 1960.  *See United States v. E-Gold, Ltd.*, 550 F. Supp. 2d 82 (D.D.C. 2008).  In *E-Gold*, the defendants were charged with violating Section 1960 based on their operation of a virtual currency service that functioned as an "alternative payment system over the Internet."  *Id.* at 85 (internal quotation marks omitted).  The defendants sought to dismiss the charge, based on the argument that Section 1960 only reaches those who "deal in cash or currency."  *Id.* at 82.  Rejecting the argument, the *E-Gold* court found that it was "clear" that the text of the statute reached virtual currency, as the statute "defines 'money transmitting' broadly to include transferring 'funds,' not just currency, by 'any and all means;' it is not limited to cash transactions."  *Id.* at 88.

Faiella appears to concede that the term "funds" has a broader meaning than real currency, as he acknowledges that the term is commonly defined to encompass "money or other liquid assets."  (Br. 3 (citing Black's Law Dictionary (9th ed. 2009)).  He thus attempts to set the term aside and focus instead on the term "money" as used in the term "money transmitting," arguing that it can only refer to government-backed currency.  (*Id.*)  Yet there is no reason to

9

construe the term "money" so narrowly either.  As Faiella acknowledges, one definition of "money" includes "[a]ssets that can be easily converted to cash."  (Br. 3 (citing Black's Law Dictionary)).  Moreover, the definition of "money" in Black's Law Dictionary specifically includes an entry for "e-money" or "electronic currency," defined as "[m]oney or a money substitute that is transformed into information . . . so that it can be transferred over information systems such as the Internet."  Black's Law Dictionary (9th ed. 2009).  In any event, there is no need to pick and choose among definitions of "money" in order to ascertain what Congress meant by "money transmitting" as used in Section 1960.  The statute includes its own definition of the term, and it speaks of transferring not "cash" or "currency," but "funds."  Had Congress intended the statute to have a narrower reach, it would have used narrower language.

Not only is Faiella's construction of Section 1960 precluded by the statute's text, it is also inconsistent with its legislative history.  Contrary to Faiella's unsupported assertion, the enactment of Section 1960 had nothing to do with Congress's interest in regulating "currency" in connection with "federal monetary policy."  (Br. 4).  To the contrary, Section 1960 was passed as an anti-money laundering statute, "designed, *inter alia*, to prevent the movement of funds in connection with drug dealing."  *United States v. Bah*, 574 F.3d 106, 112 (2d Cir. 2009) (citing H.R. Rep. No. 107-250(I), at 54 (2001)).  As explained in the Senate report accompanying the original legislation, Congress was concerned that drug dealers were turning increasingly to "nonbank financial institutions" to "convert street currency into monetary instruments" in order to transmit the proceeds of their drug sales.  S. Rep. 101-460, 1990 WL 201710 (1990) (discussion of Title II).  Section 1960 was intended to address this "gaping hole in the money laundering deterrence effort."  *Id.*

Faiella's cramped reading of the statute would fail to effectuate its broad law enforcement purpose.  Today, virtual currency exchangers are among the "nonbank financial institutions" that pose significant money laundering risks.  Congress designed the statute to keep pace with such evolving threats – which is why it cast a wide net and drafted the statute to apply to any business involved in transferring "funds . . . by any and all means."  While Faiella notes that "Congress could not have contemplated its application to virtual currencies" at the time the statute was enacted, (Br. 4), that is beside the point.  Congress sought to address a general problem susceptible to many variations.  It therefore used flexible language, capable of being adapted to ever-changing methods of moving money.  "[T]he fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity.  It demonstrates breadth."  *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) (internal quotation marks omitted); *see also Barr v. United States*, 324 U.S. 83, 90 (1945) ("[I]f Congress has made a choice of language which fairly brings a given situation within a statute, it is unimportant that the particular application may not have been contemplated by the legislators.").[2]

---

[2] Given that Section 1960 does not apply only to real currency, there is no need to address Faiella's argument that Bitcoin does not qualify as real currency.  It is worth noting, however, that the agency guidance Faiella cites for this proposition, (*see* Br. 5-6 (citing FinCEN Guidance, *supra*, and IRS Notice 2014-21, *available at* http://www.irs.gov/pub/irs-drop/n-14-21.pdf ("IRS Guidance")) in no way conflicts with the application of Section 1960 to Bitcoin exchangers.  The FinCEN Guidance clarifies the applicability of FinCEN regulations to virtual currency administrators and exchangers.  As background, it notes that virtual currency is not the same as real currency, but it does not suggest that virtual currency administrators and exchangers are exempt from regulation on that basis.  To the contrary, it advises that such entities are considered "money transmitters" under FinCEN regulations, as discussed further below.  *See* FinCEN Guidance at 1.  Indeed, the FinCEN Guidance expressly provides that "[t]he definition of a money transmitter does not differentiate between real currencies and convertible virtual currencies."  FinCEN Guidance at 3.  As for the IRS Guidance, it addresses "only the U.S. federal tax consequences" of virtual currency transactions, advising in part that they are not treated the same as foreign currency transactions.  The IRS Guidance is entirely irrelevant to Section 1960 or to anti-money laundering laws generally.

2.     **Faiella Engaged in "Money Transmitting" by Transferring Funds on Behalf of His Customers to Silk Road**

Faiella further argues that, even if Bitcoins are "funds," he still did not engage in "money transmitting" within the meaning of the statute, because he did not "transmit Bitcoin to other locations or persons," but rather simply "sold Bitcoin to customers who engaged him as a source of Bitcoin."  (Br. 8).  Faiella fails to accurately portray the nature of his own business, however. As alleged, his business involved transferring funds specifically to Silk Road; and, as a Bitcoin exchanger more generally, his business involved transferring funds to Bitcoin addresses.  In both respects, Faiella's alleged conduct involved "transferring funds."

The Indictment specifically alleges that Faiella operated a Bitcoin exchange service on Silk Road.  (Indictment ¶ 1).  As explained above, in operating that service, Faiella received cash deposits from his customers and then transferred those funds, after exchanging them for Bitcoins, to the customers' accounts on Silk Road.  These were, in essence, transfers to a third-party escrow agent – namely, Silk Road itself, which held the funds for the benefit of the customer. As noted above, Silk Road users did not have full control over the Bitcoins transferred into their accounts on Silk Road's escrow system.  Rather, Silk Road maintained the private keys to the Bitcoin addresses where Bitcoins in the system were maintained.  As a result, the funds were ultimately subject to the control of Silk Road administrators, who could block or seize user funds, without recourse by the user.  Accordingly, by sending his customers' funds to Silk Road, Faiella effected a change in the possession or control over those funds, and in that sense alone, "transferred" them. *See* Black's Law Dictionary (9th ed. 2009) (defining "transfer" as "[t]o

convey or remove from one place or one person to another; to pass or hand over from one to another, esp. to change over the possession or control of").[3]

Not only did Faiella's business involve transferring funds to a third party, but it also involved transferring funds to new locations – Bitcoin addresses.  Indeed, the operation of any virtual currency exchange typically entails transfers of funds in this sense, in that, as part of the exchange transaction, the user's funds are transferred to some type of virtual currency account. For this very reason, FinCEN has classified virtual currency exchangers as money transmitters under its regulations.  *See* FinCEN Guidance, at 4 (explaining that the transfer of funds from a "user's account at one location (*e.g.*, a user's real currency account at a bank) to the user's virtual currency account" constitutes "transmission *to another location*" (emphasis in original)).

It does not matter that, in the virtual currency context, the transfer of funds is to an online location rather than a physical location.[4]  The concern of Section 1960 is to inhibit the movement of criminal funds generally, as reflected in the fact that the statute defines "money transmitting" to include transferring funds "by any and all means."  Funds can be transferred from one type of

---

[3] Although Faiella's business thus involved transfers to a third-party, this is not to suggest that such transfers are the only type of transfers covered by Section 1960's "money transmitting" definition.  Faiella appears to concede as much, as he acknowledges that the term "transfer" encompasses transfers to "a third party *or location*."  (Br. 9) (emphasis added).  Yet, at one point, Faiella quotes *United States v. Banki*, 685 F.3d 99 (2d Cir. 2012), for the proposition that a money transmitting business "must transmit money to a recipient in a place that the customer designates, for a fee paid by the customer."  (Br. 9 (quoting *Banki*, 685 F.3d at 113 n.9)).  The quotation is misleading.  It is not a holding by the court, but part of a jury instruction that had been rejected below.  That particular part of the jury instruction was not at issue in *Banki* and was not endorsed by the Second Circuit in the case.

[4] Indeed, with the advent of online banking, the geographic location of funds is increasingly irrelevant, or even unascertainable.  *See, e.g., Yayasan Sabah Dua Shipping 5DN BHB v. Scandinavian Liquid Carriers, Ltd.*, 335 F. Supp. 2d 441, 448 (S.D.N.Y. 2004) ("In this wired age, the location of an intangible, especially a bank account, is a metaphysical question.  By and large, bank deposits exist as electronic impulses embedded in silicone chips.  In a sense, therefore, bank funds are both everywhere and nowhere.")

account to another just as they can be transferred from one geographic locale to another.  Either type of movement can facilitate criminal activity or the concealment of criminal proceeds.

This case provides a ready-made example. When Faiella's customers deposited their funds into the bank accounts he designated, those funds were incapable at that point of being used to make online drug buys on Silk Road.  Only after Faiella transferred a customer's funds to the Bitcoin address associated with the customer's online account at Silk Road were the funds rendered usable for these illegal transactions.  That is precisely the sort of facilitation of criminal activity through the movement of funds that Section 1960 was designed to prevent.

### 3.    The Application of Section 1960 to a Bitcoin Exchanger Does Not Violate the Rule of Lenity or the Due Process Clause

Lacking any support in the statutory text or legislative history, Faiella attempts to shore up his position by appealing to constitutional principles.  In particular, Faiella argues that applying Section 1960 to a Bitcoin exchange business would run afoul of the rule of lenity and would constitute such a novel and unanticipated construction of the statute as to operate like an "*ex post facto* law" in violation of the Due Process Clause.  (Br. 6-7, 11-12).  The same arguments were raised in the *E-Gold* litigation, where they were rightly dismissed, *see E-Gold*, 550 F. Supp. 2d at 100-101, as they should be here.

"The rule of lenity serves to aid the court in interpreting a criminal statute only if there is ambiguity."  *See United States v. Litchfield,* 986 F.2d 21 (2d Cir. 1993).  The Supreme Court has repeatedly admonished that the rule of lenity is "reserved . . . for those situations in which a reasonable doubt persists about a statute's intended scope even *after* resort to 'the language and structure, legislative history, and motivating policies' of the statute."  *Moskal v. United States*, 498 U.S. 103, 108 (1990) (quoting *Bifulco v. United States*, 447 U.S. 381, 387 (1980) (emphasis in original)); *see also Reno v. Koray*, 515 U.S. 50, 65 (1995) ("The rule of lenity applies only if,

after seizing everything from which aid can be derived, we can make no more than a guess as to what Congress intended." (internal citations and quotation marks omitted)).  "The doctrine is thus one of last resort," *United States v. Venturella*, 391 F.3d 120, 133 (2d Cir. 2004) (citation and internal quotation marks omitted), and does not apply "merely because it [is] possible to articulate a construction more narrow than that urged by the Government," *Moskal*, 498 U.S. at 108.

There is no irreconcilable ambiguity requiring resort to the rule of lenity here.  "The words of the statute are clear; the applicable rules of statutory interpretation are clear; and the legislative history is clear.  A business is a money transmitting business if it transfers funds on behalf of the public by any and all means." *E-Gold*, 550 F. Supp. 2d at 100.  Faiella's conduct falls comfortably within these broad terms and directly implicates the legislative motivation underlying the statute.  The rule of lenity does not supply a basis for Faiella to graft a narrowing construction onto the statute at odds with its ordinary meaning and manifest purpose.  *See id.* ("That it may be 'possible to read the statute' differently is not reason enough to bestow upon the Court *carte blanche* to disregard the plain meaning of the statute and the obvious intent of Congress in favor of an interpretation that Congress never intended and that the words could scarcely suggest." (quoting *Moskal*, 498 U.S. at 107)).

Even less apposite is Faiella's invocation of the due process principle against *ex post facto* judicial lawmaking.  Faiella cites *Bouie v. City of Columbia*, in which the Supreme Court found a due process violation based on a state court's "unforeseeable and retroactive judicial expansion of narrow and precise statutory language."  378 U.S. at 352.[5]  By contrast, applying

---

[5] Specifically, the Court in *Bouie* found a denial of due process where "the South Carolina Supreme Court interpreted a criminal trespass statute to cover 'the act of remaining on the

Section 1960 to a business engaged in the transfer of virtual currency such as Bitcoin hardly

amounts to an "unforeseeable and retroactive expansion" of "narrow" statutory language.  It is an

utterly foreseeable application of expansive statutory language that has *already* been found to

apply in the virtual currency context.  *See E-Gold*, 550 F. Supp. 2d at 101 ("The Court imposes

no novel construction upon Defendants.  Rather, it is Defendants' own novel construction of

Section 1960 . . . that created the purported ambiguity giving rise to their motion to dismiss.").[6]

Faiella's due process claim is particularly unconvincing given that the Government's

evidence includes numerous statements by Faiella reflecting that he was well aware that he was

running an unlicensed money transmitting business – and breaking the law by doing so.  (Compl.

¶¶ 36, 43, 51-52).  Those admissions include, for example, statements by Faiella to the operator

of Silk Road, in which he explained that Bitcoin exchanges have "to be licensed," and that

_____

premises of another after receiving notice to leave,' and applied that interpretation to the
defendants' conduct even though South Carolina case law up to that period had 'emphasized that
proof of notice before entry was necessary to sustain a conviction.'"  *Ortiz v. N.Y.S. Parole*, 586
F.3d 149, 156 (2d Cir. 2009) (quoting *Bouie*, 378 U.S. at 350–56) (citations omitted).  Nothing
remotely resembling this fact pattern is presented here.

[6] Faiella's claim that Section 1960 has only been applied in the Second Circuit to "Western
Union-style businesses," (Br. 11), is both inaccurate and irrelevant. It is inaccurate because
Section 1960 has in fact been applied to a variety of fact patterns, including within the Second
Circuit.  *See, e.g.*, *United States v. Ali*, 515 F. 3d 100 (2d Cir. 2008) (applying statute to hawala);
*United States v. Mazza-Alaluf*, 607 F. Supp. 2d 484 (S.D.N.Y. 2009) (applying statute to
business that moved funds through variety of bank transactions).  In any event, the claim is
irrelevant because, of course, nothing in the law prohibits a statute from being applied to fact
patterns that courts in this circuit have not specifically addressed before.  *See United States v.
Ali*, 561 F. Supp. 2d 269, 272-73 (E.D.N.Y. 2008) (rejecting argument that Section 1960 should
be given a "cash-only interpretation" based simply on the fact that prior Second Circuit case
involved cash-based business, finding "no reason why the specific facts of [that case] should
define the outer limit of the money transmitting statute"); *see also Ortiz*, 586 F.3d at 159
(holding that *Bouie* did not apply where courts had not even addressed the issue in question yet,
adding: "the unavoidable ambiguities of language do not transform every circumstance in which
judicial construction is necessary into a [due process] violation").

"FinCEN" and other law enforcement agencies would likely "seize [my] funds and me" if they were ever able to find him.  (Compl. ¶ 51).  Faiella is thus in no position, now that he has been caught, to claim surprise that he is being criminally prosecuted for his conduct.  *See United States v. Pfeiffer*, 371 F.3d 430, 437 (8th Cir. 2004) (rejecting defendant's due process challenge to alleged vagueness of criminal statute, based in part on clear evidence in the record that defendant had "actual notice" that the statute covered his conduct).

### 4.   Bitcoin Exchangers Are Required to Register as Money Transmitters with FinCEN

Lastly, Faiella errs in arguing that Bitcoin exchangers are not included within FinCEN's definition of "money transmitter."  (Br. 8).  It should be noted that this is a separate question from whether Faiella's conduct falls within Section 1960's "money transmitting" definition.  FinCEN's definition of "money transmitter" implements a distinct statute, 31 U.S.C. § 5330, with its own definition of "money transmitting business."  *See United States v. Mazza-Alaluf*, 621 F.3d 205, 210 (2d Cir. 2010) (explaining that definitions of Section 1960 and 31 U.S.C. § 5330 are distinct); *E-Gold*, 550 F. Supp. 2d at 89 (same).  Whether Faiella qualifies as a "money transmitter" under FinCEN regulations is relevant to Count One only insofar as it bears on whether Faiella was required to register his business with FinCEN – since Section 1960(b)(1)(B) (which is one of the two subsections of Section 1960 charged in Count One) makes it a crime to operate a money transmitting business that fails to comply with federal registration requirements.

As noted above, FinCEN has issued guidance specifically clarifying that virtual currency exchangers are considered "money transmitters" under its regulations.  *See* FinCEN Guidance at 1 ("[A]n administrator or exchanger [of virtual currency] *is* an MSB [money services business] under FinCEN's regulations, specifically, a money transmitter, unless a limitation to or exemption from the definition applies to the person." (emphasis in original)).  Faiella argues,

erroneously, that his business falls within an exception to FinCEN's definition of "money transmitter." Specifically, he points to an exception for a business that "accepts and transmits funds only integral to the sale of goods or the provision of services," which he claims to apply to him on the basis that "Bitcoins are 'goods.'" (Br. 8 (quoting 31 C.F.R. § 1010.100(ff)(5)(ii)(F)).

However, the exception makes clear on its face that it only applies to the "sale of goods or the provision of services[] *other than money transmission services*." 31 C.F.R. § 1010.100(ff)(5)(ii)(F) (emphasis added). For this reason, it does not apply to a Bitcoin exchanger, since the only "good" or "service" that a Bitcoin exchanger sells itself constitutes money transmitting under FinCEN's regulations. FinCEN's guidance on virtual currencies explicitly clarifies that the exception is inapplicable to virtual currency exchangers for this reason. *See* FinCEN Guidance at 4 ("It might be argued that the exchanger is entitled to the exemption from the definition of 'money transmitter' for persons involved in the sale of goods or the provision of services. . . . However, this exemption does not apply when the only services being provided are money transmission services.")

Accordingly, Faiella's business was subject to federal registration requirements and therefore falls within the scope of Section 1960(b)(1)(B).

## **CONCLUSION**

For the foregoing reasons, Faiella's motion to dismiss Count One should be denied.

Dated:  July 25, 2014                                   Respectfully submitted,
          New York, New York

                                                        PREET BHARARA
                                                        United States Attorney for the
                                                        Southern District of New York

                                                   By:  /s/ Serrin Turner
                                                        SERRIN TURNER
                                                        Assistant United States Attorney