UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

CHARLIE SHREM,

        Defendant.

14 Cr. 243-2 (JSR)

GOVERNMENT SENTENCING SUBMISSION

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States
of America

SERRIN TURNER
Assistant United States Attorney
- Of Counsel -



U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

December 17, 2014

By ECF
Hon. Jed. S. Rakoff
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007-1312

     Re:   *United States v. Charlie Shrem*, 14 Cr. 243 (JSR)

Dear Judge Rakoff:

     Contrary to the remarks in the preliminary statement of the defendant's sentencing memorandum, (Mem. 1), the story of this case is not one of tragedy, but farce. Throughout the year 2012, Charlie Shrem made a mockery of the anti-money laundering laws he was responsible for enforcing as the CEO and compliance officer of his Bitcoin exchange company, BitInstant. Shrem knew during this time that one of his large-volume customers – co-defendant Robert Faiella, whom Shrem knew only as "BTCKing" – was moving drug-buy money for others through BitInstant. Specifically, Shrem knew that "BTCKing" was selling Bitcoins to users of the Silk Road website seeking to make online purchases of illegal drugs, and that "BTCKing" was utilizing BitInstant's services to do so. Shrem, as the person at BitInstant responsible for monitoring the company's network for suspicious transactions, knew that he was required to block and report "BTCKing's" activity. Instead, he did the opposite. Shrem went out of his way to help "BTCKing" conduct business through BitInstant, personally processing his transactions, giving him discounts on his orders, and deliberately enabling him to circumvent BitInstant's anti-money laundering restrictions, which it was Shrem's job to enforce. In the process, Shrem helped "BTCKing" transmit over a million dollars to user accounts on Silk Road, where he knew most if not all of the money was destined to be spent on purchases of illegal drugs.

     The Presentence Report ("PSR") prepared by the Probation Office recommends a sentence of 57 months for Shrem, consistent with the applicable Guidelines range. The defendant's sentencing submission requests that the Court depart from the Guidelines and impose a non-incarceratory sentence. As set forth below, based on the seriousness of the offense, and the need for deterrence, that request should be firmly rejected.

# DISCUSSION

## I. A Guidelines Sentence Is Warranted by the Seriousness of the Offense

The seriousness of Shrem's conduct militates in favor of a Guidelines sentence in at least two respects. First, the volume of the funds involved in the offense is substantial, totaling approximately a million dollars that Shrem concedes he knew was intended to facilitate drug trafficking on Silk Road. Second, Shrem's conduct was in direct contravention of his obligations as BitInstant's anti-money laundering ("AML") compliance officer.

### A. The Defendant Knowingly Facilitated Nearly a Million Dollars in Drug Deals

Contrary to Shrem's contention that the amount of the funds at issue "is not rationally-related to [his] conduct," (Mem. 10), it is in fact a direct measure of the societal harm that flowed from his offense. Every transaction that Shrem helped "BTCKing" execute through BitInstant was a drug deal in waiting. The more money that Shrem helped "BTCKing" move through BitInstant, the more customers there were on Silk Road who were able to buy dangerous and illegal substances and fuel harmful addictions. And the more such purchases those customers made, the more profit wound up in the hands of Silk Road drug dealers and the site operator, allowing them to sustain and grow their unlawful enterprises.

Shrem contends that the value of the funds he moved for "BTCKing" overstates the seriousness of his offense because he himself did not reap extensive profits from his conduct. But the extent of Shrem's gain is not the issue. The issue is the potential harm caused to others from his conduct; and that harm directly correlates with the amount of money involved in the offense. As this Court has noted, "Section 1960 was passed as an anti-money laundering statute, designed 'to prevent the movement of funds in connection with drug dealing.'" *United States v. Faiella*, __ F. Supp. 2d __, 2014 WL 4100897, at *1 (S.D.N.Y. Aug. 19, 2014) (quoting *United States v. Bah*, 574 F.3d 106, 112 (2d Cir. 2009) (citing H.R. Rep. No. 107–250(I), at 54 (2001))). The value of the funds Shrem moved for "BTCking" reflects the extent to which he undermined this congressional objective and, thus, is an accurate yardstick of the seriousness of his offense. *See United States v. Bariek*, No. 05 Cr. 150 (JCC), 2005 WL 2334682, at *2 (E.D. Va. Sept. 23, 2005) (applying 18-level enhancement in Section 1960 case based on the volume of funds processed by the business: "The more money that is transmitted by an unlicensed business, the more likely that some of that money will find its way into criminal hands, and hence, the greater the harm caused.").

Moreover, while Shrem's personal profits from his offense may have been limited, it is worth noting that his conduct was driven by a profit motive. As Shrem told his business partner in explaining why he did not want to ban "BTCKing" as a customer: "We make good profit from him." (PSR ¶ 36.e). Likewise, Shrem repeatedly offered discounts to "BTCKing" based on the volume of orders he was bringing to his business, telling him in October 2012, for example: "Do you think you can increase your numbers? I'd be happy to talk about a higher rebate if you can." (PSR ¶ 40). Thus, notwithstanding Shrem's curious claim in his sentencing submission that he acted out of a desire to "promote bitcoin," (Mem. 12), his intent was manifestly to generate

profits for his business. And he was willing to do so by catering to a customer – "BTCKing" – who he knew was facilitating drug trafficking.

B.   The Defendant Blatantly Violated His Duties as an AML Compliance Officer

Shrem concedes, as he must, that in the commission of his offense "he clearly abdicated his well-defined role as the Anti-Money Laundering (AML) coordinator of BitInstant." (Mem. 13). As the PSR outlines, Shrem had "full responsibility" for BitInstant's AML program," as he had "the most comprehensive understanding of the customer flow through [BitInstant's] system" and "access to all parts of the approval process" for customer transactions. (PSR ¶ 23.a). Accordingly, he was responsible for monitoring transactions for "red flags" and "report[]ing] suspicious activities to the appropriate authorities." (PSR ¶ 23.c). Yet Shrem repeatedly flaunted the core requirements and responsibilities of this role in his dealings with "BTCKing": he regularly permitted "BTCKing" to exceed BitInstant's AML transaction limits; he permitted "BTCKing" to move large amounts of money through BitInstant without ever ascertaining or validating "BTCKing's" identity, in violation of federal law; he advised "BTCKing" on how to structure transactions with BitInstant in order to avoid drawing attention from others; and he of course never filed any Suspicious Activity Report concerning "BTCKing" with federal authorities, even though he knew "BTCKing" was operating an underground Bitcoin exchange service on a drug-trafficking website. (PSR ¶¶ 41-46).

While Shrem claims that his behavior with respect to "BTCKing" was an "aberration," (Mem. 14), his conduct did not involve mere isolated acts of indiscretion. For nearly eleven months, Shrem helped "BTCKing" move drug-purchase money through BitInstant's system, intervening on a regular basis to ensure "BTCKing's" transactions went through and making special efforts to conceal "BTCKing's" activity and identity from others, including his own business partners. Indeed, Shrem stopped aiding and abetting "BTCKing's" activity only after the company that processed cash deposits for BitInstant refused to continue working with Shrem in November 2012, based specifically on Shrem's failure to provide "an acceptable response to . . . numerous requests for information" about the large-volume transactions associated with "BTCKing." (PSR ¶ 49 & p. 41). Shrem's conduct was thus deliberate and persistent; it cannot be chalked up to a momentary lapse of judgment.

Nor can Shrem find any excuse for his conduct in the "fast-moving nature of the bitcoin business between 2011 and 2013," which Shrem claims left him "poorly prepared to provide comprehensive AML regulation." (Mem. 15). Shrem knew exactly what AML regulation required with respect to a customer such as "BTCKing." BitInstant's own compliance policies spelled it out: he was required to verify the customer's identity, given that his transactions exceeded the thresholds for know-your-customer requirements; and he was required to report the customer's transactions to the appropriate authorities, upon learning that the customer was involved in suspicious activity. (PSR ¶¶ 21-23). These duties were not shrouded in any regulatory nuance or ambiguity. They were a basic component of AML compliance, which Shrem was responsible for carrying out.[1]

---

[1] Shrem notes in his submission that, although BitInstant registered with the U.S. Department of Treasury as a money services business, its AML policy included a disclaimer that the company

## II. A Guidelines Sentence Is Further Warranted by the Need for Deterrence

Deterrence is the second factor that weighs in favor of a Guidelines sentence. This a closely watched case in an area of growing anti-money laundering concern: the use of digital currencies to transmit funds. In his sentencing submission, Shrem has much to say concerning the potential benefits of Bitcoin; and the Government does not contest that Bitcoin has legitimate uses. However, as evidenced by this case, as well as others, Bitcoin and other digital currencies pose serious new money-laundering risks, as they make it possible to transfer funds across the globe at the click of a button, and to do so anonymously, outside the traditional financial system. Effective AML compliance by digital currency exchangers such as BitInstant – the entry and exit points of digital currency networks – is essential to controlling these risks.

Moreover, willful violations of AML laws by corporate or compliance officers such as Shrem are difficult to detect. Regulatory authorities have limited resources available to audit digital currency exchanges (or other money transmitting businesses), and consequently they must depend to a large degree on good-faith compliance by these companies. Where willful failures to comply with AML requirements are detected, it is therefore important that the offenders receive substantial punishment, in order to deter others who are unlikely to be caught themselves.

Accordingly, the Court's sentence should send a clear message to other digital currency exchange businesses that flouting AML rules comes with consequences. Those rules are not a mere suggestion, or a request; they are *the law* and require adherence. It is therefore not enough for a business to make a show of compliance, by merely posting an AML policy on a website or giving someone the title of "compliance officer." The company must follow through and make AML compliance an integral part of its business ethic and transactional system.

Unless Shrem receives serious punishment, many in the digital currency industry will draw the conclusion that the AML laws need not be taken seriously. That is precisely the wrong message that needs to be heard. The Court should therefore reject the defendant's request for a non-incarceratory sentence and impose a sentence of a substantial period of incarceration, in accordance with the stipulated Guidelines range and the recommendation of the Probation Office.

---

believed it was not actually required to register, based on a regulatory exception for "payment processors." (Mem. 9). However, the exception did not apply to BitInstant; the company was in fact a money services business under federal law. (PSR ¶ 17). And despite any disclaimer to the contrary, BitInstant assumed that it qualified as a money services business for purposes of regulatory compliance, which is why the company registered as such, and why Shrem undertook the obligation of implementing and maintaining an effective AML program. Having decided to do so, Shrem cannot claim to be confused about the basic requirements such a program entails.

## CONCLUSION

For the reasons above, the Government believes that a sentence within the applicable Guidelines range is warranted in this case, as anything less would fail to "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

Respectfully submitted,

PREET BHARARA
United States Attorney

By: Serrin Turner
Assistant United States Attorney

cc: Marc Agnifilo, Esq.